**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Judy Jeanette Dvorak,

Plaintiff,

v.

Civ. No. 01-1415 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER FOR JUDGMENT**

United States of America,

Defendant.

---

Michael A. Zimmer and Keith J. Kerfeld, Tewksbury, Kerfeld, Zimmer, P.A., Minneapolis, Minnesota, for Plaintiff.

Lonnie F. Bryan, Assistant United States Attorney, Minneapolis, Minnesota, for Defendant.

---

## Introduction

This matter came on for trial before the undersigned without a jury on October 31 and November 1, 2002. This case arises out of a collision between a United States Postal Service ("USPS") mail truck and a minivan driven by Plaintiff Judy Dvorak. Dvorak has sued the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2671 et seq., to recover damages for injuries she claims she sustained as a result of the collision. The following memorandum opinion and order, which is based on the admissible evidence introduced at trial and the Court's observations of the witnesses and determinations regarding their credibility, constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

DEC 3 0 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD DEC 3 0 2002
DEPUTY CLERK

## Factual Background

### I. Plaintiff Judy Dvorak

At the time of trial, Dvorak was forty-three years old. After graduating from Saint Louis Park High School, she attended Anoka Vocational School, receiving training as an apparel specialist. For a significant part of her adult life, she has worked as a seamstress, including employment at a Pilgrim Cleaners store and several years owning and operating a store called Judy's Sew Smart. By the time her first son was born in 1989, Dvorak stopped working outside the home as a seamstress. She continued, however, to do alterations and to make clothing, draperies, boat seat and snowmobile covers, and other items from her home. Dvorak has two children: a son, Tyler, age thirteen, and a daughter, ZoAnn, age eight. Dvorak planned to return to work on a more regular basis when her daughter started first grade, in September 2001.

Dvorak's husband, Scott, is an industrial painter. For about two-and-a-half years prior to the collision, he traveled extensively with his work and frequently was gone from the home for several days at a stretch. Taking care of the house and two children on her own for extended periods of time placed stress on Dvorak. Yet witnesses described Dvorak, as they knew her prior to the collision underlying this lawsuit, as generally easy-going, positive, energetic, and caring. She enjoyed in-line skating, walking, riding horseback, and attending her son's soccer and hockey games.

## II. The Collision

On January 26, 1999, at approximately 11:30 a.m., James Hendrickson, a mail carrier employed by the USPS, was delivering mail in Saint Louis Park, Minnesota. On that day, he was driving a mail truck known as an LLV, a twelve-foot long vehicle with a four-cylinder engine and rear-wheel drive. The LLV has an S-10 front cnd and a full-sized truck rear end. Hendrickson testified that the LLV is not a very good vehicle for driving on ice and snow because the front and back ends to not track the same due to the different axels on the vehicle. The LLV's steering wheel and controls are on the right side of the vehicle as the driver faces forward.

On the day of the collision, Hendrickson was delivering mail for Route 27, which had three components: a business component, a "mounted" component in which Hendrickson delivered mail from the truck, and a walking component. Hendrickson was on the business portion of his route had turned from Wayzata Boulevard into the driveway for a building located at 7841 Wayzata Boulevard.[1] He drove to the rear of the property, turned his truck around, pulled up alongside the building, parked, and entered the building to deliver mail. He returned to the truck and drove northbound down the driveway back

---

[1] Hendrickson testified inconsistently about where in his route he was when the accident occurred. He stated in his initial examination by Dvorak's counsel that he had just started his route, had been out for approximately 20 minutes or so, and that his delivery to 7841 Wayzata Boulevard was either his first or second stop. When called by the government's attorney the next day, however, Hendrickson testfied that he was "finishing up his route" and was going to 8085 Wayzata Boulevard to deliver mail.

toward Wayzata Boulevard. Hendrickson testified that the length of driveway was approximately seventy-five feet.[2] He estimated that his speed on the driveway reached between five and eight miles per hour. The driveway slopes downward slightly as it approaches the street. To continue on his route, Hendrickson would turn left out of the driveway to proceed westbound on Wayzata Boulevard.

Wayzata Boulevard is, at that location, a two-lane road. For the length of the driveway running from the side of the building at 7841 Wayzata Boulevard down to the street, a driver sitting in a mail truck would have an unobstructed view of the traffic approaching from the west on Wayzata Boulevard. At the time of the accident, Wayzata Boulevard was wet but not icy, and was in good winter driving condition.

As Hendrickson was proceeding down the driveway toward the street, Dvorak was driving her 1990 Plymouth minivan eastbound on Wayzata Boulevard at about thirty miles per hour. In the van with Dvorak were her mother, Catherine Lambert, and her then five-year-old daughter, ZoAnn. Hendrickson testified that he saw Dvorak's van approaching from his left and applied his brakes near the end of the driveway. At first the brakes caught and the truck began to slow. It then, however, hit a patch of ice near the end of the driveway and slid about ten feet along the driveway and out into the roadway, striking Dvorak's van near the front passenger door.

Dvorak testified that she did not see the mail truck before it collied with her van.

---

[2] That distance corresponds to approximately six truck lengths.

Just before impact, Dvorak's mother, who was sitting in the right front passenger seat, told Dvorak, "That truck isn't going to stop." Dvorak was looking ahead down the road when her mother spoke and began to turn her head to the right. Dvorak had not finished turning her head completely to the right before the postal truck struck the van. The impact of the mail truck dented the passenger side of Dvorak's van at the level of the passenger side door. As Dvorak's van continued moving forward, the mail truck scraped along the side of the van.

Hendrickson testified that the driveway was wide enough to accommodate two cars side-by-side. At the time of the collision, the parking lot and driveway at 7841 Wayzata Boulevard were covered with areas of snow and ice, including patches of smooth "glare" ice. Hendrickson testified that the side of the driveway cars would use to travel down to Wayzata Boulevard had more ice on it than the side cars would use to come up from the road. John Fisher, the Saint Louis Park Police officer who arrived at the scene of the collision, testified that the presence of ice and snow pack on parking lots and driveways was obvious to motorists driving that day. Officer Fisher also testified that, given the ice in the parking lot and on the driveway, he would expect a motorist to slow down and use due care.

At the time of the collision, a witness, Joe Smith, was driving eastbound on Wayzata Boulevard a few car lengths behind Dvorak's van. He observed Hendrickson's mail truck approach the end of the driveway and believed, from what he observed, that

Hendrickson intended to turn across Wayzata Boulevard between Dvorak's van and Smith's vehicle. As a result, Smith slowed his speed as he approached the driveway, increasing the following distance between himself and Dvorak's van. Smith did not notice the postal truck slow before it hit Dvorak's van.

## III. Dvorak's Physical and Mental Health Following the Collision

At the moment of impact, Dvorak had both hands on the steering wheel and had begun to turn her head slightly to the right; she instantly experienced jaw pain on the right side of her face. Immediately after the accident, she reported right-sided jaw pain to Officer Fisher. Officer Fisher asked whether she required medical attention at the scene, and she said no. About four hours after the collision, she went to her chiropractor, where she reported pain in her right temporomandibular joint ("TMJ"). The chiropractor referred her to Dr. Roy Hakala at the Minnesota Craniofacial Center. He diagnosed a bilateral TMJ disc dislocation and associated headache, muscle spasm, and neck pain. Dr. Hakala concluded that Dvorak had sustained a serious re-injury to her right TMJ (which had been operated eleven years earlier) and a new injury to her left joint.

Dvorak subsequently saw Dr. Lawrenz, an oral and maxillofacial surgeon, regarding the condition of her jaw. By that time, Dvorak had a very limited range of motion in her jaw and could not open her mouth widely. Dr. Lawrenz discerned a pronounced crepitus, or grating noise caused by the rubbing of bone on bone, in Dvorak's right TMJ and observed on her MRI results swelling in her left joint due to ongoing

damage. On October 26, 1999, Dvorak underwent bilateral TMJ surgery, in which Dr. Lawrenz manipulated and relocated the left temporomandibular disc within Dvorak's left TMJ and fashioned a replacement disc for Dvorak's right TMJ from cartilage harvested from Dvorak's ear. This surgery alleviated Dvorak's jaw pain and headaches somewhat but did not eliminate them entirely. At an independent medical examination in July 2002, Dvorak continued to experience soreness and pain in her jaw.

Within hours of the accident, Dvorak also reported neck and back pain to her chiropractor. Pain in those areas, consistent with soft tissue injury, has persisted since the accident. Sometime after the accident, Dvorak also began to experience pain in her right shoulder. On February 21, 2000, Dr. Frank Norberg performed surgery on Dvorak's right shoulder to repair a cartilage tear in the shoulder capsule. On an ongoing basis since the collision, Dvorak also experiences non-specific facial pain, numbness and weakness on her right side, and a limited range of motion in her neck and shoulders.

Dvorak experiences chronic pain – that is, pain that continues for more than six months and has a significant impact on the patient's quality of life. In May 2002, Dvorak completed a three-week chronic pain program at Sister Kenny Institute under the direction of Dr. Matthew Monsein. The focus of the Chronic Pain Rehabilitation Program is not the alleviation of pain but rather is to help patients deal with their pain in a more effective manner. In his assessment letter to Dvorak's referring physician upon her completion of the pain clinic, Dr. Monsein noted some improvement in her mood and

affect and observed that she had cooperated and participated willingly in the program. Dvorak testified that she has been doing exercises from the chronic pain program every other day at her home.

In addition to chronic pain, Dvorak displays indications of psychological distress, specifically depression. These symptoms include anxiety, depression, and sleep disturbances. She also reports experiencing cognitive dysfunctions such as difficulty in concentrating, remembering, reading, and doing paperwork. In September 2002, Dr. Monsein at the Sister Kenny Institute saw Dvorak for a follow-up visit. At that time, he observed that Dvorak seemed to have regressed in that she was clearly more agitated and expressed more depressive symptoms than when she had left the program three months earlier in June. Dr. Monsein also assessed Dvorak as having a somatic dysfunction – i.e., physical complaints of pain that are not apparently caused by structural abnormalities or other organic processes, but rather are caused by psychological processes.

## Analysis and Conclusions of Law

### I. Standard of Decision

The Federal Tort Claims Act provides that the United States is liable, as a private person, for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting under the

scope of his office or employment."[3] 28 U.S.C. § 1346(b). The applicable law is that of the state in which the alleged act or omission occurred – in this case, Minnesota. The parties do not dispute that Dvorak exhausted her administrative remedies before bringing this lawsuit.

## II. Negligence

To prove a claim of negligence under Minnesota law, the plaintiff must show (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty was the proximate cause of the injury. Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995). The Court first considers the parties' arguments as to whether Hendrickson breached his duty of care as a motorist. It will next consider the question of causation and, finally turn to the issue of damages.

### A. Breach of a Duty of Care

Without question, Hendrickson owed a duty of care to Dvorak. Under Minnesota law, motorists owe a duty to their fellow motorists to exercise reasonable care in the operation of their vehicles. Berg v. Nelson, 559 N.W.2d 722, 724 (Minn. Ct. App. 1997). As part of that exercise of reasonable care, a motor vehicle driver must keep a proper lookout and keep his vehicle under control. See Van Tassel v. Hillerns, 248 N.W.2d 313, 315 (Minn. 1976). "It must be conceded that the degree of care which an operator of a

---

[3] The provisions of Title 28, United States Code, relating to tort claims (including the Federal Tort Claims Act) applies to tort claims arising out of activities of the USPS. U.S. v. Q Int'l Courier, Inc., 131 F.3d 770, 775 (8th Cir. 1997) (citing 39 U.S.C. § 409(c)).

motor vehicle must exercise in fulfillment of his duty to maintain an adequate lookout [and control] varies with the circumstances . . . ." Wallace v. Nelson, 178 N.W.2d 698, 701 (Minn. 1970).

Specifically, a driver has a duty to drive at an appropriately reduced speed when special hazards exist due to weather or road conditions. See Minn. Stat. § 169.14, subd. 3; see also Minn. Stat. § 169.14, subd. 1 (requiring every driver to be aware of hazards on the road, to use due care, and to reduce speed as necessary to avoid collisions). Furthermore, "the driver of a vehicle about to enter or cross a roadway from any place other than a roadway shall yield the right-of-way to all vehicles approaching on the roadway to be entered or crossed." Minn. Stat. § 169.20, subd. 4; Ferguson v. Kehoe, 71 N.W.2d 168, 170 (Minn. 1955) (holding that § 169.20, subd. 4 applies to entering or crossing a roadway from a private parking area). The violation of a traffic regulation is prima facie evidence of negligence. Minn. Stat. § 169.96; Janssen v. Neal, 256 N.W.2d 292, 294 n.1 (Minn. 1977). Once the plaintiff has established a prima facie case of negligence, the burden of proof shifts to the violator to show excuse or justification for the violation. Borris v. Cox, 73 N.W.2d 372, 374 (Minn. 1955).

It is undisputed that Dvorak had the right-of-way on Wayzata Boulevard and was operating her vehicle at a lawful speed. Accordingly, she had the right to assume that a driver approaching from a driveway would comply with the traffic laws, would stop before entering the road, and would yield the right-of-way to her. See Oldendorf v. Eide,

110 N.W.2d 310, 312 (Minn. 1961); cf. Minn. Stat. § 169.20, subd. 1(e) (vehicle traveling at unlawful speed forfeits right-of-way). The Court determines that, under the circumstances present here, Dvorak did not herself breach any duty to keep a reasonable lookout or to avoid the collision by moving left into the lane of oncoming traffic.

The United States argues that the mere skidding of an automobile is not proof of negligence, and that skidding on ice may occur without fault. While those assertions are true, it is also true under Minnesota law that "if such skidding could have been prevented by the exercise of ordinary care, then it is evidence of negligent driving." Oldendorf, 110 N.W.2d at 312-313; accord Yurkew v. Taylor, 89 N.W.2d 723, 726 (Minn. 1958) (holding that "where there is evidence as to the conduct of the driver of an automobile preceding or following skidding from which an inference of negligence can be drawn, the question is for the jury"). Hendrickson did not come upon the ice at the end of the driveway without warning. He had driven up the self-same driveway minutes before the accident. The ice on the driveway and parking lot at 7841 Wayzata Boulevard was obvious, as was the fact that the driveway sloped downward to the street. The mail truck slid at the end of the driveway because, in light of the conditions, Hendrickson traveled down the driveway at a speed that prevented him from stopping in time to avoid a collision. According to Hendrickson's testimony, in less than fifty feet, he had reached a speed of between five and eight miles per hour. Cf. Bigo v. Duluth, Missabe & Iron Range Ry., 115 N.W.2d 230, 234 (Minn. 1962) (holding that, where driver knew trains

crossed highway at grade, and nevertheless drove in thick fog at a speed that prevented him from stopping in time to avoid collision, he bore consequences of breaching duty to exercise care commensurate with the hazardous conditions in which he drove).

The Court concludes that Hendrickson could have prevented the skidding of his mail truck through the exercise of ordinary care appropriate to the circumstances of the condition of the driveway. It was his duty to anticipate his approach to the main road and, if need be, to yield the right-of-way to oncoming vehicles. Hendrickson had the opportunity to observe the condition of the driveway at 7841 Wayzata Boulevard when he arrived at the building minutes before the accident to deliver mail. He had already been driving on his route that morning for at least twenty minutes, and should have been familiar with the condition that morning of less-traveled areas such as driveways and parking lots. See Benson v. Dunham, 174 N.W.2d 687, 689 (Minn. 1970). Hendrickson failed to operate the truck at a reasonable rate of speed given the surface condition of the driveway, and he failed to keep his truck under control.

The United States contends that Hendrickson was not negligent because he was faced by an emergency through no negligence of his own. The "emergency rule" in Minnesota provides that "one, suddenly confronted with a peril, through no fault of his own, who, in an attempt to escape, does not choose the best or safest way, should not be held negligent because of such choice, unless it was so hazardous that the ordinarily prudent person would not have made it under similar conditions. " Byrns v. St. Louis

County, 295 N.W.2d 517, 519 (Minn.1980). A party can proceed on such a theory of defense, however, only if the evidence shows that the emergency was not created or contributed to by the negligence of the party seeking its benefit. Daugherty v. May Bros. Co., 121 N.W.2d 594, 599-600 (Minn. 1963); see also Gran v. Dasovic, 147 N.W.2d 576, 579 (Minn. 1966) (stating that isolated patch of ice constitutes an emergency). As discussed above, Hendrickson contributed to the emergency by his own negligence. The ice on the driveway did not appear without warning. He had driven past the spot on which he skidded minutes before and failed to be attentive to the condition of the driveway. His excessive speed and failure to anticipate adequately his vehicle's approach to Wayzata Boulevard along an icy driveway having a downhill grade contributed to the emergency.

The Court concludes that Hendrickson breached the duty of care owed to Dvorak, a fellow motorist. Hendrickson was negligent, and Dvorak was not.

**B. Causation**

Having determined that Hendrickson negligently operated the mail truck prior to the accident, the Court further concludes that his negligence caused the collision with Dvorak's minivan. The question presented, therefore, is whether the collision caused Dvorak's injuries. To establish that the defendant's negligence proximately caused an injury, the plaintiff must show that (1) the defendant's act was one which those exercising ordinary care would have anticipated would cause injury, even though the defendant

could not have anticipated the particular injury which did happen, and (2) the defendant's negligent conduct was a "substantial factor" in bringing about the injury. Lubbers, 539 N.W.2d at 401. The Court concludes that Hendrickson's conduct in traveling down the driveway at 7841 Wayzata Boulevard was, under the circumstances, an act that a person exercising ordinary care would have anticipated would cause injury. The Court turns to the question of whether that conduct was a "substantial factor" in bringing about Dvorak's claimed injuries. The Court begins with Dvorak's physical injuries.

**1. Physical complaints**

Dvorak complains of several injuries, physical and psychological, that she claims are attributable to the collision. The most straightforward of these is the injury to her jaw. Dvorak complained almost immediately after the accident of right-sided jaw pain. She reiterated those complaints to her chiropractor within hours of the accident. Within two days of the accident, Dr. Hakala diagnosed bilateral dislocation of the temporomandibular discs. As the United States' forensic psychologist testified, such displacement cannot be faked and certainly can cause pain.

Dvorak's jaw was not in pristine condition prior to the accident. She had undergone surgery eleven years earlier on her right TMJ. That surgery had been successful, however, in addressing Dvorak's condition at the time. All of the witnesses who knew Dvorak socially before the accident credibly testified that they had never heard her complain of any jaw pain between that surgery in 1988 and the collision. Medical

records indicate that, although Dvorak experienced clicking in her jaw in 1993, it had quiesced after a period of time. Dvorak's jaw was asymptomatic prior to the accident.

The Court determines, as discussed by Dr. Lawrenz in his testimony, that Dvorak's jaw underwent a "hyper-extension and flexion" or "whiplash" mechanism at the moment of impact. Her vehicle suddenly decelerated from thirty miles an hour because the mail truck struck her vehicle with sufficient force to dent the passenger side door and scraped along the side of the minivan as it continued eastbound on Wayzata Boulevard.

From the perspective of tort law, Dvorak had an "eggshell jaw." Yet, the United States must take the plaintiff as it finds her. See Orbeck v. Larson, No. C1-00-1274, 2001 WL 345453 at * 3-4 (Minn. Ct. App. Apr. 10, 2001). It is irrelevant that the United States could not reasonably foresee the degree of harm that would arise from Hendrickson's collision with Dvorak's vehicle. The collision caused traumatic damage bilaterally to the temporomandibular discs in Dvorak's jaw, and hence was a substantial factor contributing to Dvorak's jaw pain, headaches, referred neck and back pain, and the need for bilateral TMJ surgery.

The same hyper-extension and flexion mechanism that caused injury to Dvorak's jaw also injured soft tissue in her neck and back. Dr. Tulloch, a neurologist retained by the United States, acknowledged that the nature of Dvorak's accident was such that the mechanism for causing such injury to her back and neck could be present. Dvorak has continued to complain of back and neck pain. Whether those pains are presently

attributable to an organic cause or to a psychological cause will be addressed below.[4]

Turning to Dvorak's shoulder, the Court concludes that she failed to clearly establish that the collision was a substantial factor in the tear to the anterior-superior glenoid labrum.[5] There is no evidence to substantiate that Dvorak's elbows were locked as she gripped the steering wheel at the moment of impact, such that the force of deceleration could be transmitted through her arms to the capsule for her shoulder. Nor is there evidence that the collision aggravated a pre-existing condition that was asymptomatic. The record indicates that Dvorak had injured her shoulder years earlier playing softball, and one can reasonably infer that her labral tear is consistent with having been caused by a pitching motion. The Court cannot conclude that the collision was the proximate cause of her shoulder complaints.

### 2. Psychological complaints

Dvorak also seeks damages for psychological injuries that she claims result from

---

[4] During the five or six years prior to the accident, Dvorak saw her chiropractor, Dr. Arne, on several occasions with complaints about back, neck, shoulder, and abdominal pain. Dvorak testified that she does not have a specific recollection about seeing Dr. Arne on specific occasions, but conceded it was possible that she experienced some mild problems with her back, neck, and shoulder from time to time for which she sought a chiropractic adjustment. The United States has pointed to no significant number of entries in Dvorak's medical records indicating that, prior to the accident, she was experiencing pain in her back, neck or shoulder that substantially interfered with her daily living. Nor do Dvorak's medical records before the accident evidence a pain disorder.

[5] The glenoid labrum is a ring of fibro-cartilage in the ball-and-socket joint of the shoulder, where the head of the humerus (the "ball") articulates with the glenoid cavity of the scapula (the "socket"). The glenoid labrum attaches to the margin of the glenoid cavity to increase its depth.

the accident. Her current psychological state is complicated; those who have assessed her have consistently diagnosed at least two major psychological disorders – a major depressive disorder and somatoform disorders – and a mixed personality disorder that includes paranoia, hysteria, and dependency. The United States argues that Dvorak's depression and somatoform disorder were present long before the accident and were not caused by the accident. The Court considers each of the psychological disorders in turn.

With respect to depression, the record reflects that Dvorak had raised with her family practice physician the possibility that she might be depressed on December 22, 1998, approximately one month before the collision. Dvorak's physician noted that she said she had been struggling with her mood for the last few years, although it seemed to be worse recently. His notes of his conversation with her are as follows:

> She attributes much of it to the fact that she has two children, and her husband travels extensively for his job, sometimes being gone two or three weeks at a time. She ends up feeling like a single mom, fairly trapped. She enjoys her children, but really does not have much time for herself. She does try occasionally to get one of her sisters to watch the kinds and go out with friends or other family members, but ends up then needing to repay that in taking care of additional kids. Sometimes it works out well; other times not so well. Her appetite and weight have crept up. She has had some difficulty with sleep, both with falling asleep and awakening at 3:00 to 4:00 a.m. Her energy level tends to be low.

Her physician recorded his concern that her symptoms were compatible with depression. He discussed with Dvorak "some things she could do to try to free herself up from her children, and also the need to discuss things with her husband. Lastly, we are going to start some Zoloft, 25 mg initially for a few days, and then increase to 50. Contact in a

couple of weeks with a progress report." There is no evidence, however, that her family practice physician either provided or made arrangements to provide Dvorak with a prescription for Zoloft, nor did he apparently raise with her the possibility of psychotherapy or refer her to a psychologist.

A few weeks after seeing her physician, and about ten days to two weeks before the collision, Dvorak took a vacation with her sisters and an aunt to Mexico. Her sisters credibly testified that, on that trip, Dvorak was outgoing and active, riding horseback and walking on the beach, participating in the fun of the trip. Dvorak testified that she did not take the samples of Zoloft her doctor had provided because she did not believe she felt bad enough to need it. From her medical records and the testimony of friends and family, the Court determines that Dvorak was not, prior to the accident, experiencing a major depressive episode that substantially interfered with her daily living.

With respect to Dvorak's somatoform disorders, the United States points to several examples from her medical records which, it contends, demonstrate that she had a predisposition to somatization prior to the accident – that is, to make complaints of physical symptoms that have no discernable organic cause but rather arise out of psychological issues, such as anxiety. The forensic psychiatrist retained by the United States, Dr. Bruggemeyer, opined that Dvorak had a proclivity to somatization prior to the accident. Dr. Bruggemeyer acknowledged, however, that Dvorak's contacts with healthcare providers before the collision did not constitute a psychological disorder.

The United States further argues that, since the accident, Dvorak has been malingering – that is, consciously lying about her medical history, feigning symptoms, or exaggerating symptoms in order to obtain a secondary goal. The United States specifically contends, relying on an assessment by forensic psychologist Dr. Bruggemeyer, that Dvorak has seized on the accident as a convenient springboard to develop herself into a full-time victim and patient. The psychologist retained by the United States – Dr. Gregory Hanson – would not opine, however, as to whether Dvorak has been consciously engaging in malingering because of this litigation. He testified that there may be both conscious and subconscious components to Dvorak's behavior, the subconscious component being potentially associated with a somatoform disorder or with a personality disorder such as hysteria.

If Dvorak was indeed depressed prior to the accident, it was a mild episode; she experienced little interference with her ability to work or socialize and evidenced little distress. The collision seriously aggravated Dvorak's mental condition, including her depressed state. The Court finds persuasive Dr. Monsein's opinion that physical pain can make depression worse and that being depressed can make it much more difficult to cope with chronic pain. Dr. Bruggemeyer, the United States' forensic psychiatrist, confirmed this, testifying that depression often follows a chronic pain syndrome. In this case, Dvorak experienced chronic pain in connection with the injury to her jaw, including associated headaches, neck and back pain. This pain was present not only for the nine

months prior to Dvorak's jaw surgery in October 1999 but also after the surgery which, unfortunately, did not eliminate her jaw pain. Dvorak's depression has impacted her ability to cope with her chronic pain, and the pain in turn feeds the depression.[6]

Somatoform disorders complicate this pain-depression relationship for Dvorak. As the United States' forensic psychologist persuasively testified, Dvorak has been suffering from a pain disorder (i.e., the presence of psychological, as opposed to physiological, factors contributing to the onset, severity, or worsening of pain in one or more body areas, causing material distress and impairing daily living) and/or an undifferentiated somatic disorder (i.e., the experience of a physical complaint, such as pain, lasting six months or longer that either cannot be explained by a general medical condition or is more severe than would be expected). The Court finds credible Dr. Monsein's testimony that he cannot identify a physiological cause for Dvorak's complaints of right-side weakness and his opinion that her lack of strength on that side has a psychological origin.

The Court rejects the United States' arguments that malingering plays a significant role in Dvorak's presentation of her physical condition; the Court finds her behaviors – including inconsistencies in statements regarding her medical history – to be the result of her somatoform disorders together with cognitive dysfunctions associated with severe and longstanding depression. The psychologist retained by the United States, Dr. Hanson,

[6] The Court also finds persuasive Dr. Monsein's testimony that Dvorak was at risk for the development of a chronic pain syndrome prior to the accident, having recently experienced some depression and having evidenced signs of anxiety.

administered a memory test demonstrating that Dvorak has problems with memory. The Government's forensic psychiatrist, Dr. Bruggemeyer, acknowledged that serious depression can lead to cognitive difficulties. Despite this evidence, the United States insists that inaccuracies in Dvorak's statements regarding her pre-accident health history are the product of a conscious decision to feign and exaggerate her current medical condition. The Court is not persuaded.

### 3. Conclusions

The collision between Dvorak's minivan and Hendrickson's mail truck was a substantial factor contributing to the bilateral disc displacement injuries in Dvorak's jaw and the chronic pain associated therewith. The collision was also a substantial factor contributing to soft tissue injuries to Dvorak's neck and back. As a result of the accident, Dvorak has developed a chronic pain syndrome that continues to the present. In addition, the collision and the pain arising from her physical injuries have been a substantial factor in aggravating Dvorak's mental health problems. It worsened what had been a mild depressive episode and has fostered a vicious circle of pain and depression. The accident has also been a substantial factor in Dvorak's development of somatoform disorders, complicating the interaction of pain and depression. Some of the pain Dvorak now experiences is a product not only of physiological but also psychological factors.

## C. Damages

Dvorak seeks damages in the following five areas: past pain, disability, and

emotional distress; past health care expenses; future pain, disability, and emotional distress; future earning capacity; and future health care expenses. The Court considers each category in turn.

**1. Past pain, disability, and emotional distress**

As a result of the injury to her jaw at the time of impact, Dvorak suffered pain in the jaw itself, headaches, muscle spasms, a loss of her normal range of motion, and severe crepitus (a grating sound caused by the rubbing of bone on bone) in the right TMJ. To repair the damage to the temporomandibular discs bilaterally, surgery was necessary. Unfortunately, it did not successfully relieved Dvorak's complaints of jaw pain and headaches. The collision has also either caused or aggravated a number of psychological problems, most notably a chronic, recurrent, and severe major depressive disorder and somatoform disorders. Dvorak's quality of daily life has been and continues to be severely impacted by both the physical and psychological consequences of the accident. The Court determines that, for past pain, disability, and emotional distress, Dvorak shall have and receive from the Defendant the sum of $75,000.00.

**2. Future pain, disability, and emotional distress**

Dr. Lawrenz credibly testified that it is not surprising that the surgery on Dvorak's jaw did not fully address the pain associated with her bilateral derangement. He indicated that Dvorak is at risk for experiencing jaw pain on a permanent basis. Furthermore, the fact that she has had surgery on her temporomandibular joints means that they will not

have the same strength and ability to withstand force as healthy joints that have not been operated on. Finally, the ear cartilage used to fashion the replacement graft for the disc in Dvorak's right TMJ is not as durable as the fibro-cartilage out of which a temporo-mandibular disc is naturally made; therefore, Dvorak also faces the potential of further surgery on her jaw.

The Court cannot find, however, that Dvorak's prognosis is hopeless. Breaking the circle of pain and depression by concentrating on Dvorak's psychological issues will ultimately allow for more effective chronic pain management. The Court concludes that, for future pain, disability, and emotional distress, Dvorak shall have and receive from the Defendant the sum of $75,000.00.

### 3. Past health care expenses

Dvorak has submitted to the Court total health care expenses of just under $100,000.00. This sum includes medical expenses related to Dvorak's shoulder problem, including surgery in 2000, that totaled $17,130.00. The Court has concluded, however, that the labral tear in her right shoulder was neither proximately caused nor aggravated by the collision. Accordingly, the medical expenses associated with Dvorak's right shoulder must be deducted from her claimed medical expenses.

Dvorak's claimed health care expenses also include the cost of QEEG treatment by Dr. John Nash. The United States has presented unrebutted evidence that Dr. Nash's feedback therapy with QEEG is not a medically accepted treatment methodology. The

Court will therefore deduct $8,379.90, the amount of Dr. Nash's invoices from Dvorak's recoverable health care expenses.

The Court also finds that Dvorak has submitted invoices for the period from October 21, 1999 to August 30, 2002 from Park Nicollet Clinic, where she treats with her family practice physician, Dr. Haugen. The treatment codes for that time period almost all describe medical conditions unrelated to the musculoskeletal and psychological issues that the Court has found to have been causally related to Dvorak's accident. The Court concludes that all but $82.28 of the medical expenses charged by Park Nicollet Clinic during that period are not recoverable. Finally, the Court notes that Dvorak has submitted invoices from Dr. Axel, D.D.S., who is the family dentist for the Dvoraks. Apparently, Plaintiff seeks to recover the costs associated with a porcelain filling Dr. Axel installed in her mouth in April 2002. Yet Dvorak has failed to establish that the filling bears any causal relationship to the collision in 1999. The Court will therefore deduct $2,265.00, the amount claimed from Dr. Axel's invoices, from Dvorak's medical expenses.

Based on the foregoing, the Court concludes that Dvorak shall have and receive form the Defendant for past health care expenses the sum of $70,905.80.

**4. Future medical expenses**

The psychologists and medical doctors who testified for both Dvorak and the United States consistently recommended that Dvorak visit a psychopharmacologist for an evaluation of her current medication regime; her depression, anxiety, and sleep

disturbances have not, heretofore, been well-managed. Both the forensic psychologist retained by the United States and Dr. Monsein also testified that Dvorak urgently needs to pursue a course of psychotherapy in a highly structured environment for approximately three weeks. Such a course of treatment would cost approximately $15,000.00. For both the psychotherapy and the psycho-pharmacology work, the Court awards $17,000.00.

### 5. Lost wages

Dr. Philip Haber conducted a vocational and psychological evaluation of Dvorak and opined that, in her current physical and psychological condition, she is not capable of gainful employment either using her former skills as a seamstress or otherwise.[7] The Court finds credible Dr. Haber's testimony that a seamstress in the Twin Cities regional economy has an average annual earning potential of $28,724.00.

The Court determines that Dvorak's circle of pain and depression may best be broken by concentrating on her psychological issues. The Court cannot find that Dvorak

---

[7] Starting in the spring of 2002, Dvorak tried to earn income by selling kitchen products through the "Pampered Chef" program, a direct sales program modeled on Tupperware's in-home sales approach. Dvorak gets paid through the "Pampered Chef" program on commission. Dvorak testified that, to be profitable at such a business, she should be presenting merchandise shows in people's homes. She booked one show at another person's home in May 2002, and found it extremely difficult to present the products; she has difficulty remembering specific facts about specific products and cannot, on her own, transport her pack of sample products to the host home. She has no plans to book other shows. She has made a few sales by having people look through the Pampered Chef catalog. She testified, however, that she has not really made money selling Pampered Chef products because she has received little in the way of commissions and made an initial outlay of her own funds to by the product pack.

will never be able to work again. Rather, the Court finds that it will take time -- perhaps a year to eighteen months -- for Dvorak to benefit markedly from regular psychotherapy and more effective psychopharmacological treatment. Accordingly, the Court awards Dvorak lost wages from September 2001 -- when Dvorak intended to return to work as a seamstress – through June 2004 – approximately eighteen months from the date of this order, at the rate of $28,724.00 per year, for a total of $78,991.00 in lost wages.

**Order for Judgment**

Based on foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that

(1) James Hendrickson, a USPS employee, was negligent in operating his motor vehicle in connection with the collision between his vehicle and Dvorak's van on January 26, 1999;

(2) Dvorak was not negligent in connection with that collision;

(3) Hendrickson's negligence was the sole cause of the collision;

(4) the collision was a substantial factor in causing injuries to Dvorak's jaw, neck, and back, and also aggravated and caused psychological difficulties for Dvorak; and

(5) as monetary damages arising from the collision, Dvorak shall have and receive from the Defendant United States of America the sum of $316,896.80, plus costs and disbursements.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: December 30, 2002

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*